IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SARAH SOLOMON, on behalf of herself
and all individuals similarly situated,
      Plaintiff,

v.                                  Civil Action No. 3:19-cv-266

EQUIFAX INFORMATION SERVICES LLC,
      Defendant.

## OPINION

The parties in this case have requested the Court to approve a settlement. The proposed settlement contains two troublesome terms: (1) a request for an order requiring the defendant to follow certain proposed future credit reporting procedures and holding those procedures lawful, and (2) a demand that the Court approve a restriction on the ability of some of the plaintiff's lawyers to handle certain cases in the future. The Court cannot approve the settlement as requested, because it cannot—and will not—approve in advance a plan of action that the Court dimly understands. Nor will the Court approve a restriction on the practice of plaintiff's counsel; this restriction violates public policy.

## I.  NATURE OF THE CASE AND TERMS OF THE SETTLEMENT

Sarah Solomon filed this suit asserting that Equifax Information Services, LLC, incorrectly reported information about her credit history. This case involves Equifax's analysis of her bankruptcy proceedings, which went on for several years. Solomon originally filed for Chapter 13 bankruptcy, commonly called a wage earner's plan. When a debtor files under Chapter 13, she gets some relief from current debt, but agrees to follow a plan in which she will pay off some or all of her obligations over a set period of time.

After Solomon filed under Chapter 13, she incurred "new" debt in addition to what she had listed in her Chapter 13 plan.[1]  Unfortunately, she could not comply with her Chapter 13 plan, and so converted it to a Chapter 7 bankruptcy.  Under Chapter 7, the bankruptcy court liquidates the petitioner's assets, and discharges all her debts.  In Solomon's case, her Chapter 7 bankruptcy eliminated both the remaining debt in her original Chapter 13 case, and the "new" debt incurred after filing the Chapter 13 case.

Equifax uses a complex computer program to determine—and report—a consumer's credit obligations.  In the case of Solomon, and others like her, it reported that her debts listed in her Chapter 13 bankruptcy no longer existed.  But Equifax did not catch the discharge under Chapter 7 of her "new" debt; it reported that she still owed those creditors.  The effect of this error is obvious: if Solomon applied for credit, her Equifax report would show that she still owed the "new" debt, thus making her a worse credit risk than she really was.

Because of this error, Solomon filed this case as a class action on behalf of herself and others similarly situated.  Solomon has not moved the Court to certify the case as a class action.

The parties have tentatively reached an individual settlement in the case.  While the agreement resolves only Solomon's personal claim, it has elements common to class action settlements.  The parties have not presented the settlement agreement to the Court, but have told the Court about two of its provisions.  First, they have agreed that Equifax will adopt a complicated coding procedure for its computers.  This procedure will pick up the discharge of "new" debt after the conversion of a Chapter 13 to a Chapter 7 bankruptcy.  This procedure essentially tracks what

---

[1] Although it sounds counterintuitive for a person in bankruptcy to incur new debt before paying off the existing debt, it can happen for legitimate reasons.  A debtor, for instance, might need to buy a car during the Chapter 13 payoff period, and would need to borrow money to make the purchase.

2

the court ordered in a similar case, *White v. Experian Information Solutions, Inc.*, No. 8:50cv1070 (C.D. Cal. Aug. 19, 2008).  In *White*, the court entered a 36-page order requiring the defendants in that case to change their procedures in many interrelated ways, with a set of computer codes designed to pick up situations like Solomon's.  Here, Solomon and Equifax ask the Court to enter a consent decree containing an injunction requiring Equifax to abide by the *White* procedure, with some modifications to pick up "new" debt.  Further, they ask the Court to hold that Equifax's future procedure complies with the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, and "all equivalent state statutes."  (Dk. No. 37-1, ¶ 4.)[2]

Second, they have asked the Court to approve an agreement between Equifax and some of plaintiff's counsel in this case that restricts the ability of those lawyers to bring further claims similar to this one.  This restriction would apply during the eighteen months that the consent decree remains in effect.

## II. DISCUSSION

### A. Injunction and Imprimatur

In essence, the parties ask the Court to enter an injunction that incorporates a 36-page order entered by a court in California.[3]  The settlement agreement modifies the California injunction in some way technical way (unknown to the Court) designed to capture new debt discharged when consumer converts her bankruptcy to Chapter 7.  The *White* decree contains pages of highly technical computer jargon, incomprehensible to the Court.  Except in general terms, the parties

---

[2] Recognizing that it is a bit much to ask the Court to find that the revised procedure satisfies all state laws, the plaintiff said at the hearing that she would no longer insist on this certification. Equifax did not agree with this, which indicates that the parties may no longer have an agreed disposition of the case.

[3] Nothing in this Opinion casts any doubt on the wisdom or legality of the *White* decree. The *White* court entered its order after considerable litigation among the parties, and a great deal of thought by the court.

have not explained the *White* decree to the Court, nor have they shown the Court how the proposed order in this case changes the decree.  Moreover, if the Court enters the proposed order, someone might return at some point to ask the Court to hold Equifax in contempt of terms the Court does not understand.

And going beyond all that, the parties ask the Court to hold that the new order complies with the FCRA and "all equivalent state statutes."  (Dk. No. 37-1, ⁋ 4.)  The Court has no idea whether the settlement agreement complies with the laws of grammar and punctuation, to say nothing of the FCRA.  And the Court does not know what "equivalent state statutes" exist, or how the proposed agreement satisfies them.

Further, the Court cannot anticipate the myriad problems that might arise under the agreement and might amount to potential violations of the FCRA.  The Court can only address concrete disputes.  The proposed agreement can allow Equifax to argue in some as yet unknown case that this Court gave its blessing to the agreement as a lawful way to comply with the FCRA.

This the Court cannot do.

### B.  Restriction on Practice

The parties also ask the Court to approve a restriction on the future practice of Leonard Bennett and his firm, Consumer Litigation Associates ("CLA").  Specifically, the settlement agreement, if approved, would forbid Bennett and CLA from taking similar cases to this one against Equifax for the duration of the proposed consent decree.

This comes as no surprise.  Bennett and his firm have nettled credit reporting firms for decades.  They played a major role on the plaintiff's side in the *White* case, and, just when the credit reporting agencies thought they had wrapped up their problems in *White*, Bennett and CLA brought this similar action for Solomon, and a related case against Trans Union, LLC.  *See*

4

*Solomon v. Trans Union, LLC*, No. 3:19cv255 (E.D. Va. Apr. 10, 2019).  Bennett has a limitless stable of clients with credit problems, an encyclopedic knowledge of consumer law, and endless creativity in finding new ways to sue credit bureaus.  It is small wonder Equifax wants him out of play.

But lawyers' ethical rules do not favor the practice of shutting down opposing counsel. Rule 5.6 of the American Bar Association's Model Rules of Professional Conduct forbids agreements that, as part of resolving litigation, limit the areas of practice of a lawyer.  *See* Model Rules of Prof'l Conduct r. 5.6(b) (Am. Bar Ass'n 2019).  All states have similar rules, and most of them flatly prohibit such limitations.[4]  Virginia, however, has tweaked the ABA rule to allow restrictions with the approval of the appropriate tribunal.  Virginia's Rules of Professional Responsibility provide as follows:

A lawyer shall not participate in offering or making:

(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy, except where such a restriction is approved by a tribunal or a governmental entity.

Va. Rules of Prof'l Conduct r. 5.6(b).  Apparently, this rule almost never comes into play. Virginia's courts have never interpreted this provision, and the Virginia State Bar's Legal Ethics Opinions have not addressed it.

Lawyers play a number of roles in society.  "A lawyer is a representative of clients or a neutral third party, an officer of the legal system and a public citizen having special responsibility for the quality of justice."  Va. Rules of Prof'l Conduct, Preamble.  Practicing lawyers face a

---

[4] *See* Variations of the ABA Model Rules of Professional Conduct, Rule 5.6: Restrictions on Right to Practice, Am. Bar Ass'n, CPR Policy Implementation Committee, https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc_5_6.pdf (last updated Sept. 29, 2017).

difficult balance of their "responsibilities to clients, to the legal system and to the lawyer's own interest in remaining an upright person while earning a satisfactory living." *Id.*

Lawyers have a monopoly on the ability to practice law, and their monopoly mandates that their first priority should be to serve the public. One way they do so is by insuring "the freedom of clients to choose a lawyer." Model Rules of Prof'l Conduct r. 5.6 cmt. 1 (Am. Bar Ass'n 2019). A strong cadre of able attorneys helps society operate fairly. No doubt, the success of lawyers like Bennett makes credit bureaus think twice before they mistreat a consumer.

Yet, the Virginia rule recognizes that sometimes it might be best to allow a lawyer to agree to a restriction on her practice. The comments to Virginia's rule suggest that, in a settlement that provides broad social benefits (such as a mass tort case), a lawyer might agree to not sue the defendant again. Va. Rules of Prof'l Conduct r. 5.6 cmt. 2. Indeed, this Court approved such a resolution in *Gibbs v. Curry*, No. 3:18cv654, Dk. No. 64 (E.D. Va. June 19, 2019), where a lawyer persuaded a defendant to contribute millions of dollars to a fund to benefit the victims of the defendant's wrong-doing, and in return agreed not to sue him again. While the results here certainly benefit Solomon and others, they do not provide the extraordinary assistance that came in *Gibbs*.

As Bennett notes, other lawyers in Virginia protect consumers. But they are few in number. To allow Bennett to restrict his practice, even in a limited way, would violate the public interest, so the Court will not approve this provision of the settlement.

### III. <u>CONCLUSION</u>

The Court declines to approve the proposed settlement in this case. Accordingly, the Court will deny the parties' joint motion for settlement approval.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: <u>5 June 2020</u>
Richmond, VA

/s/
_____
John A. Gibney, Jr.
**United States District Judge**